UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| STEPHANIE MICHELE CASH, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 5:22-cv-199-GMB |
| KILOLO KIJAKAZI, Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

On July 29, 2020, Plaintiff Stephanie Michele Cash filed an application for disability insurance benefits ("DIB") with an amended alleged disability onset date of March 22, 2020. On June 3, 2021, an administrative law judge ("ALJ") denied Cash's claim. Cash appealed the decision, and the Appeals Council denied Cash's request for review on January 14, 2022. As a result, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration.

Cash's case is now before the court for review pursuant to 42 U.S.C. § 1383(c)(3). Under 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties have consented to the full jurisdiction of a United States Magistrate Judge. Doc. 11 at 1–2. Based on a review of the parties' submissions, the relevant law, and the record as a whole, the court concludes that the decision of the Commissioner is due to be affirmed.

## I.  STANDARD OF REVIEW

The court reviews a Social Security appeal to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court will reverse the Commissioner's decision if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The court "may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner," but rather "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (citation and internal quotation marks omitted). "Even if the evidence preponderates against the Secretary's factual findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). Moreover, reversal is not warranted even if the court itself would have reached a result contrary to that of the factfinder. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

The substantial evidence standard is met "'if a reasonable person would accept the evidence in the record as adequate to support the challenged conclusion.'" *Holladay v. Bowen*, 848 F.2d 1206, 1208 (11th Cir. 1988) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). The requisite evidentiary showing has been

described as "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The court must scrutinize the entire record to determine the reasonableness of the decision reached and cannot "act as [an] automaton[] in reviewing the [Commissioner's] decision." *Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987). Thus, the court must consider evidence both favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990).

The court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Grant v. Astrue*, 255 F. App'x 374, 375–76 (11th Cir. 2007) (citing *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must show the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  Cash bears the burden of proving that she is disabled and is responsible for producing evidence sufficient to support her claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

A determination of disability under the Social Security Act requires a five-step analysis. 20 C.F.R. § 404.1520(a).  The Commissioner must determine in sequence:

>   (1) Is the claimant presently unable to engage in substantial gainful activity?
>   (2) Are the claimant's impairments severe?
>   (3) Do the claimant's impairments satisfy or medically equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
>   (4) Is the claimant unable to perform his former occupation?
>   (5) Is the claimant unable to perform other work given his residual functional capacity, age, education, and work experience?

*See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015). "'An affirmative answer to any of the above questions leads either to the next question, or, [at] steps three and five, to a finding of disability.  A negative answer to any question, other than at step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (quoting 20 C.F.R. § 416.920(a)–(f)). "Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*,

762 F.2d 1516 (11th Cir. 1985)).

## III.  RELEVANT FACTUAL BACKGROUND

Cash was born in 1970, so she was 49 years old on her alleged onset date and 51 years old on the date of the ALJ's decision. R. 41.  In her disability report, she alleged that multiple sclerosis, migraine headaches, hypertension, obesity, and a fractured left foot limit her ability to work. R. 288.  Cash has four or more years of college and obtained a bachelor's degree in social work and a master's degree in education. R. 41–42 & 289.  She previously worked as a restaurant cashier, in insurance sales, and as a social worker. R. 289.

The ALJ held a hearing in Cash's case on April 22, 2021. R. 39.  At the hearing, Cash testified that her migraines make it difficult for her to work in light or sunlight, and she has received Botox injections every 13 weeks since 2017 because of her migraines. R. 44 & 46.  She stated that the Botox treatments "help to a point," but her migraines increase around the tenth week following each treatment. R. 44–45.  Cash testified that she still gets migraines "on a regular basis" despite the treatment and even with the help of medications. R. 45.

When asked about her daily activities, Cash testified that she cares for her dog, prepares her meals, does her laundry, reads, crochets, attends church and her support group, and maintains her finances. R. 352 & 354–57.  But she gets fatigued when she wakes up, takes her dog out, and eats breakfast. R. 48.  Cash drives herself

to the grocery store once per week, cleans her home, and exercises about three days per week. R. 54–55.

The ALJ received evidence from a Vocational Expert ("VE"), who initially offered the opinion that a hypothetical person at Cash's age and with her abilities could return to her previous work as an insurance sales agent, a family case worker, and a child welfare caseworker, but could not return to work in her restaurant job due to the fumes and heat. R. 60–61. After further questioning from Cash's counsel, the VE admitted that Cash did not renew the license that would enable her to work some of her prior jobs and that she would have to drive for other positions. R. 61–71. Based on this testimony, and out of an abundance of caution, that ALJ found that Cash could not return to her prior work. R. 25.

Cash submitted several medical records to the ALJ to support her claim of disability, including treatment records from Dr. Christopher LaGanke. On December 15, 2020, Dr. LaGanke drafted a disability support letter summarizing Cash's symptoms and his prognosis of her conditions. R. 633. In pertinent part, Dr. LaGanke's letter stated:

- "Ms. Cash experiences: Chronic fatigue, dizziness, hypertension, insomnia, intermittent vision blurring, migraines with photo/phonophobia, paresthesia, recurrent UTI's, tremors, unsteady gait and chronic pain." R. 409 & 633.
- "Her symptoms can wax and wane, but can be exacerbated by cold, heat, humidity, vibrations, odors, dust, gases, stress, fatigue, etc." R. 409 & 633.
- Cash has debilitating chronic fatigue, migraines three to five times per week, and would miss more than three to four days of work per month.

> R. 409 & 633.
> - "When she is fatigued, she would have difficulty in the ability to: concentrate and remember, staying on task, to appropriately respond to ordinary work changes and stress, and to appropriately respond to the public, co-workers, and supervisors." R. 409 & 633.
> - "She has been intolerant of many medications and we are in the process of trying to get her [multiple sclerosis ("MS")] symptoms under control. . . . With her conditions, she will experience good days and bad days, but she has had more bad days than good days per week." R. 409 & 633.
> - If she returned to the workforce, Cash would need three or four 20-minute breaks a day and would not be able to work consistently for 50 weeks out of the year. R. 409 & 633.
> - "If she is able to work, it would be unpredictable when she would be able to work and it would be a very small percentage of time and productivity." R. 409 & 633.
> - "Her prognosis is fair at the present time, but her MS will likely worsen over time.  MS is a disease that is progressive, but is stable at best." R. 409 & 633.
> - "The patient's condition meets: Social Security Listing of Impairments-Adults (Part A)—Section 11.09 Multiple Sclerosis with (C.)." R. 409 & 633.

The ALJ found Dr. LaGanke's letter to be conclusory, speculative, and inconsistent with his own treatment notes. R. 18.  Furthermore, the ALJ found that Dr. LaGanke's opinion contradicted medical records from Dr. Francisco Caycedo, Dr. Joseph Jowers, and Amy Burdette-Gray, CRNP. R. 18 & 21–24.  The ALJ also observed that Dr. LaGanke's conclusion that Cash meets the criteria for any of the Social Security Listings is an administrative finding and not a medical question. R. 24.

Cash initially saw Dr. LaGanke in August 2013, when she complained of headaches three or four times per week for the past several months, and

intermittently for years. R. 453, 466 & 471. By September 2013, Cash's headaches had improved with a Relpax medication Dr. LaGanke prescribed. R. 459. After using the medication for a few years, Cash's migraine treatments began to include Botox injections. R. 493. She received her first Botox injections around April 2016 and tolerated them well. R. 493. Dr. LaGanke administered the injections every 13 to 14 weeks. R. 437. Between April 2016 and February 2021, Cash visited Dr. LaGanke at least 18 times for Botox injections. R. 493–94, 437, 442–43, 445, 450, 495–96, 499, 501, 505, 507–08, 510, 514, 516, 518, 634 & 646. During almost every visit, Cash stated that the treatment helped to control her migraines, except that she would sometimes have migraines in the last week so before her next round of Botox. R. 493–94, 437, 442–43, 445, 450, 495–96, 499, 501, 505, 507–08, 510, 514, 516, 518, 634 & 646. Cash often claimed she "did well," and even at times, "very well," between Botox treatments. R. 443–42, 445, 450, 495–96, 499, 501, 510, 516 & 518. And between February 2019 and January 2021, Cash reported that she was free of headaches during a number of visits with her primary care doctor, Dr. Joseph Jowers. R. 540, 544, 550, 557, 561, 566, 640 & 660. Despite these reports, Cash prepared a "headache log" which purportedly documents the timing of her Botox treatments and headaches between January 2020 and August 2020. Doc. 12 at 13.

Cash also provided dermatology, urology, and orthopedic healthcare records. Cash consistently presented normally during these appointments, and although the

office visits were check-ups for other medical issues,[1] these records do not contain reports of headaches or migraines. R. 585, 588, 592, 599, 600, 603, 606, 612, 615, 618–19 & 624.  During her annual wellness exam and follow-up appointment with Dr. Jowers in November 2020 and January 2021, Cash presented with no anxiety or depression, did not report a headache, was in no acute distress, had normal cognitive function, was well oriented, and appeared normal overall. R. 640–42 & 659–62. Between February 2020 and November 2020, during six visits with her orthopedist, Dr. Caycedo, Cash did not report debilitating symptoms. R. 611–28.  Dr. Caycedo conducted general examinations each visit, during which Cash consistently presented with a well oriented metal status, an appropriate mood and affect, and adequate grooming. R. 612, 615 & 624.  Only during one visit did Cash present with a negative neurological symptom, when she reported "loss of coordination." R. 619.

Cash also provided medical records from three urology appointments between September 2019 and September 2020 with Amy Burdette-Gray, CRNP. R. 598–608 & 636–39.  Cash reported that she had urinary urgency but was not completely incontinent. R. 601–05.  Cash presented well oriented and otherwise normally. R. 598–600 & 601–07.

Finally, Cash provided her dermatology records to support her claim. R. 583–

---

[1] Each of Cash's dermatology, urology, and orthopedic records reflect the results of a physical examination, whether described as a "multi-system physical examination" or "general exam." *See* R. 588, 602 & 612.

9

94. During three visits between April 2019 and April 2020, Cash presented well developed, not in distress, and did not report headaches. R. 583–85, 587–88 & 591–92.

With her application for benefits, Cash submitted a Function Report. R. 351–62. In the report, she stated that she lives alone and can perform multi-step activities, such as caring for her dog, preparing meals, doing laundry, driving, shopping in stores, attending church weekly, visiting her parents, and attending her monthly support group. R. 351–52, 354 & 356–57. Cash claimed she can walk for 30 minutes before needing to take a break and can focus for two-hour segments at a time. R. 360.

Applying the sequential evaluation process, the ALJ found that Cash has not engaged in substantial gainful activity since her alleged onset date of March 22, 2020. R. 13. At step two, he found that Cash suffered from the following severe impairments: multiple sclerosis, post lower extremity fracture, migraines, osteoarthritis of the ankles, and degenerative disc disease. R. 13. The ALJ noted that these medically determinable impairments significantly limit Cash's ability to perform basic work activities. R. 13. At step three, the ALJ found that Cash did not have an impairment or combination of impairments meeting or medically equal to the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 16–19.

Before proceeding to step four, the ALJ determined that Cash had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(a) with the following limitations:

> Occasionally lift and/or carry, including upward pulling of 20 pounds, and can frequently lift and/or carry, including upward pulling of 10 pounds. She can sit for 6 hours in an 8-hour workday with normal breaks and stand and/or walk with normal breaks for 6 hours in an 8-hour workday. She cannot work on ladders, ropes, or scaffolds, at unprotected heights, or around dangerous machinery. No commercial driving, no work around large bodies of water or open flame. She can frequently balance, stoop, kneel and crouch but no crawling. No frequent exposure to extreme cold and heat, no frequent exposure to fumes, dusts, gases and poor ventilation. No outside work.

R. 19. The ALJ relied on the VE's testimony to find that a person with Cash's limitations could not perform Cash's past work as a Family Case Worker, Child Welfare Case Worker, or Insurance Sales Agent. R. 25. However, the ALJ found that Cash could perform a number of other jobs that exist in significant numbers in the national economy, including work as a Storage Facility Clerk, Small Products Assembler, or Price Marker. R. 26. As a result, at step five of the five-step sequential process, the ALJ found that Cash was not disabled within the meaning of the Social Security Act from March 17, 2020, through the date of the decision. R. 27.

## IV. DISCUSSION

On appeal, Cash makes two arguments. She first claims the ALJ erred in the weight given to the opinions of her treating physician, Dr. LaGanke. Doc. 15 at 1–

7. Cash's second argument is that the ALJ improperly evaluated her migraine impairment in determining her RFC.[2] Doc. 15 at 8–14. The Commissioner contends that the ALJ properly considered Dr. LaGanke's statements and medical opinions, and that substantial evidence supported the ALJ's assessment of RFC. Doc. 13 at 5 & 19. Furthermore, the Commission argues that Cash failed to prove that her headaches caused additional work-related limitations. Doc. 13 at 19. For the following reasons, the court finds that substantial evidence supports the ALJ's determination and that the ALJ applied the proper standards to reach his conclusions.

## A. Treating Physician's Opinion

Cash first claims that the ALJ improperly considered the medical opinions in Dr. LaGanke's disability support letter. Doc. 15 at 5.

The Social Security Act requires the Commissioner to "make every effort to obtain from [an] individual's treating physician . . . all medical evidence, including diagnostic tests, necessary in order to properly make [a disability] determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. §§ 423(d)(5)(B) & 1382c(H)(i). But it does not specify how the ALJ must evaluate treating source evidence, and the Eleventh Circuit recently confirmed that the new regulations eliminate the hierarchy of

---

[2] Cash's initial brief characterizes these as three issues, but her reply brief combines the second and third arguments. *Compare* Doc. 12 at 1, *with* Doc. 15 at 1 & 8–14.

medical opinions known as the "treating physician rule," which had been in place until recently. *Harner v. Soc. Sec. Admin.*, 38 F.4th 892, 897–98 (11th Cir. 2022).

Under the new regulations, an ALJ should focus on the persuasiveness of an opinion by looking at the opinion's supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2) & 416.920c(b)(2). The ALJ may, but need not, explain how he considered other factors—such as the source's specialization and relationship with the claimant—when assessing a medical opinion. *See id.* "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(1) & 416.920c(c)(1). And "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(2) & 416.920c(c)(2).

Furthermore, opinions such as whether a claimant is disabled, the assignment of the claimant's RFC, and the application of vocational factors "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner," and on these issues the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The court instead looks to the "doctors' evaluations of the claimant's condition and the medical consequences thereof, not their opinions of

the legal consequences of [that] condition." *Lewis*, 125 F.3d at 1440; *see also* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Such statements by a physician are relevant to the ALJ's findings, but they are not determinative because it is the ALJ who bears the responsibility for assessing a claimant's RFC. *See, e.g.*, 20 C.F.R. § 404.1546(c).

Bearing in mind the new treating physician standard, the court concludes that substantial evidence supports the ALJ's decision to find Dr. LaGanke's opinion to be unpersuasive.

First, Dr. LaGanke makes a number of conclusory statements about Cash's symptoms, many of which are not supported by the medical record. For example, in the disability support letter, Dr. LaGanke stated that Cash's migraine symptoms "wax and wane," but his medical records between October 2016 and February 2021 reflect that the Botox treatments consistently managed Cash's migraines, with the exception of a few migraines immediately before her next round of injections. R. 494, 437, 442–43, 445, 466, 495–96, 499, 501, 505, 507–08, 510, 514, 518, 634 & 646. Dr. LaGanke's letter then claims that Cash suffers from chronic, debilitating fatigue, yet during her regular physical exams, Cash presented normally, well oriented, well developed, and not in any apparent distress. R. 438–39, 446–47, 454, 455, 467–68 & 650. Cash also presented as alert, with her memory intact, with clear

14

speech, and with the ability to concentrate. R. 438, 447, 455, 468 & 650.

Similarly, Dr. LaGanke stated that Cash has been intolerant of many medications such that they still were trying to get her MS symptoms under control, but according to his own notes in February 2021, she had not experienced a relapse since he prescribed the medication Mavenclad, which she tolerates well. R. 648. As to her MS symptoms, Cash's scans in February 2021 revealed no active lesions and Dr. LaGanke noted that her condition had been stable for the past two and a half years. R. 645. And at the time of her May 2018 scans, in turn, there had been no or minimal change for the last five years. R. 504 & 642.

Second, the claims made in Dr. LaGanke's letter contradict medical records from Cash's other treatment providers. For example, Dr. LaGanke states that Cash had debilitating migraines, difficulty with concentrating and remembering, had more bad days than good days per week, and her ability to work would be unpredictable. R. 633. But during her November 2020 and January 2021 appointment with Dr. Jowers, Cash presented with no anxiety or depression, did not report having a headache, was in no acute distress, had normal cognitive function, was well oriented, and appeared normal overall. R. 659–62. And during Cash's 2020 visits with Dr. Caycedo, she consistently presented as well oriented, with an appropriate mood and affect, and adequately groomed. R. 612, 615 & 624. These records also do not contain any reference to headaches. R. 612, 615 & 624. Over that nine-month span,

15

aside from her ankle and foot injuries, Cash presented normally with no other consistent health concerns. R. 611–28.

Cash also provided medical records from three urology appointments with Amy Burdette-Gray, CRNP, between September 2019 and September 2020. R. 598–608 & 636–39. During each appointment, Cash presented as normal and well oriented. R. 598–607. Cash's physical exams, conducted during her urology appointments, do not reflect any complaints of headaches. R. 598–608. And during Cash's dermatology visits between April 2019 and April 2020, she presented as well developed, not in distress, and without headaches. R. 583–85, 587–88 & 591–92.

For these reasons, the court concludes that the ALJ applied the proper standard in evaluating Cash's medical evidence. The ALJ clearly articulated his reasons for finding that Dr. LaGanke's opinion was not well supported or consistent with his own or other physicians' medical records. Furthermore, the court finds that substantial evidence supported this decision.

**B.     RFC Assessment**

Cash's second claim is that the ALJ "did not apply proper legal standards in determining her RFC" when he "failed to determine Ms. Cash had further limitations from migraine headaches than being limited to no outside work." Doc. 15 at 8–14. The Commissioner responds that "merely having a condition does not establish the existence of work-related limitations." Doc. 13 at 19. The court finds that substantial

evidence supports the ALJ's determination and that he applied the proper standards to reach his conclusions.

Social Security Ruling 96-8p dictates that the ALJ in assessing a claimant's RFC first must determine the claimant's functional limitations and then address her ability to work on a function-by-function basis pursuant to the functions described in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. SSR 96-8p, 1996 WL 374184, at *1. The RFC "is not the least an individual can do despite. . . her limitations or restrictions, but the most." *Id*. The regulations mandate a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id*. at 7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's RFC must "[c]ontain a thorough discussion and analysis of the objective medical and other evidence"; "[i]nclude a resolution of any inconsistencies in the evidence as a whole; and set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id*. The RFC assessment "must be based on all of the relevant evidence in the case record, such as: medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, evidence from

17

attempts to work, need for a structured living environment, and work evaluations, if available." *Id.* at 5.

It is the ALJ's exclusive responsibility to assess the claimant's RFC. *Moore v. Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016). The ALJ does not need to enumerate every piece of evidence or function used in his determination, but he must show that he considered the claimant's medical conditions in totality. *Dyer*, 395 F.3d at 1211; *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009). The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his findings with respect to a claimant's "functional limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Castel*, 355 F. App'x at 263.

In this case, the ALJ first found that Cash has medically determinable impairments that could reasonably cause some of her alleged symptoms. But while the medical evidence confirms a history of migraines, the ALJ found that the objective evidence does not show that these symptoms support a more restrictive RFC finding. R. 13. In arriving at this assessment, the ALJ assessed all relevant evidence of Cash's ability to do work-related activities, including her physical abilities, mental abilities, and other abilities affected by impairments. Specifically,

as discussed above, the ALJ thoroughly addressed Cash's migraine complaints when he referenced her migraine pain, her prescribed medications, and the Botox injections used to successfully treat most of her migraines. R. 13, 19 & 22. The ALJ also noted the inconsistencies between Cash's headache log and her medical records. R. 19. Only upon consideration of all of this evidence did the ALJ arrive at the RFC stated in his decision, which includes the limitation that Cash is not to work outside, where she would be exposed to sunlight that may trigger a migraine headache. Cash has not shown that this is an inappropriate limitation or that her complaints of migraines, which her records show to be well controlled by medication, support a more restrictive RFC. This court is not permitted to reweigh the evidence or substitute its judgment for the ALJ's opinions where, as here, there is substantial evidence supporting the ALJ's decision.

## V. CONCLUSION

Upon review of the administrative record, and considering all of Cash's arguments, the court finds the Commissioner's decision is supported by substantial evidence and based on the proper legal standards. Accordingly, the decision is due to be affirmed. A final judgment will be entered separately.

DONE and ORDERED on July 25, 2023.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE